UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
DONNA COVEL,                   )
                               )
            Plaintiff,         )
                               )
v.                             )    CIVIL ACTION NO.
                               )    09-10866-PBS
                               )
MICHAEL J. ASTRUE, Commissioner,)
Social Security Administration, )
                               )
            Defendant.         )
_____)
```

**MEMORANDUM AND ORDER**

SEPTEMBER 16, 2010

SARIS, U.S.D.J.

## I.   INTRODUCTION

Plaintiff Donna Covel, who suffers from various physical and mental ailments, appeals from the final decision of the Commissioner denying her Social Security disability and disability insurance benefits.  After review of the record, the Court **DENIES** plaintiff's motion to reverse the Commissioner's decision, but **ALLOWS** the motion to remand.  The Court **DENIES** defendant's motion to affirm the decision.

## II.   BACKGROUND

### A.   Occupational and Medical History

Plaintiff was born on October 2, 1961.  (Administrative Transcript ("Tr.") at 20.)  She continued in school through ninth grade and earned a GED in 1986.  (Id. at 28, 148.)  In 1992, she

received a license as a Certified Nurse's Assistant from the Fall River Red Cross.  (<u>Id.</u> at 148.)  She also received a hair dressing license, but both of these licenses have expired.  (<u>Id.</u> at 28.)  In her most recent job, plaintiff worked as a nurse's assistant approximately eight hours per day, four days per week. (<u>Id.</u> at 143.)  She was fired from this job on February 18, 2007, because she had failed a Criminal Offender Record Information check.  (<u>Id.</u> at 143.)  Plaintiff had worked as a house cleaner and hairdresser in the past, but not since 1998.  (<u>Id.</u> at 29.)

Plaintiff has not worked or applied for any jobs since the onset of her alleged disability on February 18, 2007.  (<u>Id.</u> at 29.)  Since then, she has received $300 per month in welfare payments and $174 per month in food stamps.  (<u>Id.</u> at 29-30.) Although she does not work and no longer drives a car, she is able to cook, wash dishes, do light dusting and laundry, vacuum, and shop for groceries.  (<u>Id.</u> at 17, 35-36, 155-57.)  She regularly reads, watches television, plays board games, and occasionally sews and crafts beaded jewelry when her hands are not bothering her.  (<u>Id.</u>)

### 1.  <u>Physical Conditions</u>

Although plaintiff's mental ailments are the primary focus of this dispute, she suffers from numerous physical conditions. She was diagnosed with hepatitis C in March 2006 at Greater New Bedford Community Health Center, Inc.  (<u>Id.</u> at 13, 413-16.)  She

was later treated with Interferon Ribovirin therapy, which was terminated in April 2007 when it was determined to be ineffective.  (Id. at 502-03, 622.)  Dr. Daniel Pratt, plaintiff's treating physician at that time, stated that there were no restrictions on her work duties as a result of her hepatitis.  (Id. at 407.)

Plaintiff also suffers pain and fatigue from fibromyalgia and arthritis in various joints.  In September 2007, Dr. Richard Jaslow examined her for bilateral knee pain, as well as joint pain in her hands, diagnosing arthritis of multiple IP joints and both knees and prescribing Lodine and injections of Xylocaine and Celestrone.  (Id. at 339-40.)  Although she does not suffer from rheumatoid arthritis, plaintiff saw Dr. Michael Hait, a rheumatologist, for her myalgias and polyarthritis on July 30, 2008.  (Id. at 589.)  She reported aches all over her body for several months, with numbness and weakness in her fingers that often caused her to drop items she was carrying.  (Id.)  Dr. Hait determined that there were no provoking factors for her pain, and that she was able to perform her daily activities.  (Id.) Plaintiff reported that her fibromyalgia was alleviated with cannabis, which was never prescribed.  (Id.)

On August 4, 2008, Dr. Jung Mi Haisman performed a trigger finger release surgery on plaintiff, reporting that she regained full flexion and good sensation in her fingers and that there was no more locking or catching of her finger joints.  (Id. at 598.)

-3-

On December 1, 2008, Mr. Brian McCabe, a physical therapist,
completed an upper extremity questionnaire indicating that
plaintiff experienced moderate pain from fibromyalgia and
rheumatoid arthritis, that she could lift ten pounds frequently,
use foot controls continuously, sit for two hours, and stand or
walk for one hour at a time; she could also sit, stand, and walk
for a total of four hours during an eight-hour work day.  (Id. at
634-37.)

   **2.  Mental Conditions**

      **a.  Treating Sources**

   In 1999, Dr. Dennis Callen, plaintiff's primary care
physician, diagnosed her with dysthymia, a mild form of chronic
depression, and treated her through 2006 with Zoloft for
depression and anxiety.  (Id. at 206, 216, 234.)

   On May 24, 2007, she saw Ms. Kristin Theofanides, M.Ed., a
therapist at Child and Family Services, who observed that she had
pressured speech, racing thoughts, a history of explosive and
aggressive outbursts out of proportion to any precipitating
stressors leading to assaultive acts or destruction of property,
depressed affect, diminished interest in activities,
sleeplessness, lack of energy, feelings of hopelessness, and poor
concentration.  (Id. at 361-362, 367.)  Ms. Theofanides diagnosed
plaintiff with bipolar disorder and determined that her Global

-4-

Assessment of Functioning ("GAF") score was 50, indicating serious impairment.  (Id. at 360.)

On July 6, 2007, Dr. Lucyna Dolliver, M.D., a board-certified psychiatrist, evaluated plaintiff and reported that she had a history of emotional problems dating back to age thirteen. (Id. at 375-76.)  She noted that plaintiff's symptoms include anxiety, decreased interests, crying spells, mood swings, impulsivity, anger, and irritability.  (Id. at 375-76, 379.)  She diagnosed plaintiff with recurrent major depression, and ruled out bipolar II disorder, prescribing Zoloft, Topamax, and Xanax. (Id. at 380.) She stated that plaintiff's then-current GAF was 50, and that her highest in the past year was 65. (Tr. At 380)

Plaintiff continued to receive counseling from Child and Family Services through December 2008, seeing Dr. Dolliver approximately once every three months and Ms. Theofanides once per week.  (Id. at 33.)  Her diagnosis remained recurrent major depression (id. at 368, 372), and she was prescribed Cymbalta, Xanax, Zoloft, and Trazodone at various times with mixed success but no adverse side effects (id. at 37, 370).  During this period, plaintiff's mood would improve and deteriorate periodically, and Dr. Dolliver's notes indicate that she often would feel better, yet still suffer from anxiety and mood swings. (Id. at 381-84, 491-93, 496.)

Dr. Dolliver completed an Emergency Aid to the Elderly, Disabled and Children Medical Report on June 20, 2008, indicating

that plaintiff's diagnosis was major depressive disorder and
bipolar disorder (<u>id.</u> at 558), and recounting the same panoply of
symptoms reported by Ms. Theofanides (<u>Id.</u> at 559).  Dr. Dolliver
predicted that plaintiff's condition would improve but could not
provide a time frame for improvement.  (<u>Id.</u> at 558.)  She  also
opined that plaintiff's mood lability and depressive symptoms
would impact her comprehension and memory in a work setting, and
that, although she could be cooperative and pleasant to her co-
workers and supervisors, her mood swings could cause her to
become aggressive.  (<u>Id.</u> at 559.)  Dr. Dolliver reported a
history of conflicts between the plaintiff and her former co-
workers and supervisors due to her volatile mood.  (<u>Id.</u>)

On July 18, 2008, Dr. Dolliver completed a medical source
statement of ability to do work-related mental activities in
which she opined that plaintiff was markedly impaired in her
ability to understand, remember, and carry out complex
instructions, to make judgments on complex work-related
decisions, and to maintain concentration for extended periods of
time.  (<u>Id.</u> at 614.)  However, Dr. Dolliver also reported that
plaintiff was moderately impaired in her ability to interact
appropriately with the public, her supervisors, and her co-
workers, to respond appropriately to usual work situations and to
changes in the work routine, to understand, remember, and carry
out simple instructions, and to make judgments on simple work-
related decisions.  (<u>Id.</u>)  In a letter dated November 12, 2008,

-6-

Dr. Dolliver and Ms. Theofanides stated that they had treated plaintiff since May 2007 and "observed periods of relative mood stability interspersed with episodes of marked impulsivity and aggressive behaviors."  (Id. at 638).  At this time, Dr. Dolliver and Ms. Theofanides added a provisional diagnosis of Impulse Control Disorder to the previous diagnosis of recurrent major depression.  (Id.)

### b.   Non-Treating Sources

In June 2007, Dr. Robert Cserr evaluated plaintiff in person at the behest of Disability Determination Services.  (Id. at 309.)  Dr. Cserr determined that plaintiff had a depressive disorder, not otherwise specified ("NOS"), with recurrent, many, and variable episodes lasting 1-2 weeks occurring at least monthly over many, many years, as well as a personality disorder, NOS, with many cluster B symptoms specifically of the anti-social and borderline variety.  (Id. at 311.)  Dr. Cserr noted that she was "currently functioning in the vicinity of [a GAF score] of 60," indicating a moderate impairment.  (Id.)

During that same month, Dr. Joan Kellerman, a consultive clinical psychologist at Disability Determination Services, reviewed plaintiff's medical records.  (Id. at 312-26.)  Dr. Kellerman diagnosed her with dysthymic disorder (id. at 316), noting that her daily activities were not restricted and that she was restricted only mildly in maintaining social functioning and

concentration (<u>id.</u> at 323).  Dr. Kellerman determined that plaintiff's chronic depression waxed and waned, but was treated with medication and did not appear to be severe.  (<u>Id.</u> at 325.)

Sheree Estes, Psy.D., a clinical psychologist, performed a consultative evaluation on plaintiff on May 24, 2008.  (<u>Id.</u> at 539-542.)  She diagnosed plaintiff with bipolar disorder, an anxiety disorder with panic features, and a personality disorder. (<u>Id.</u> at 542.)  She assessed plaintiff's GAF score at 50, indicating serious impairment.  (<u>Id.</u> at 542.)  Dr. Estes also administered a Mini-Mental Status Examination, and found that plaintiff scored 29/30, with difficulty only on the memory portion of the exam.  (<u>Id.</u> at 541.)

## B.  <u>Procedural History</u>

Plaintiff applied for Social Security Income disability benefits on March 20, 2007.  (<u>Id.</u> at 112-28.)  Her claims were denied initially by the state agency (<u>id.</u> at 64-69), and later by the Federal Reviewing Official (<u>id.</u> at 54-63).  On April 1, 2008, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (<u>Id.</u> at 76.)  On December 4, 2008, ALJ Barry H. Best conducted a hearing at which plaintiff and Mr. Michael LaRaia, a vocational expert, testified.  (<u>Id.</u> at 23-51.)  In an opinion issued on December 29, 2008, the ALJ determined that plaintiff was not disabled.  (<u>Id.</u> at 6-22.)  The ALJ found that plaintiff had a moderate impairment in maintaining concentration, but she

was able to focus on simple work tasks for a standard eight-hour work day, provided that she was given short breaks every two hours.  (<u>Id.</u> at 12-13.)  Likewise, he found that she was impaired moderately in her ability to interact appropriately with others, but she was able to deal with the public on an occasional basis. (<u>Id.</u>)  Relying on the testimony of Mr. LaRaia, the ALJ determined that, although plaintiff could not return to her previous employment, she could perform a variety of sedentary, unskilled jobs that exist in sufficient numbers in the national economy, and therefore was not disabled.  (<u>Id.</u> at 20.)  Plaintiff's case was selected for review by the Decision Review Board, which, on March 31, 2009, found no basis to disturb the ALJ's decision. (<u>Id.</u> at 2-7).  Plaintiff brought this suit pursuant to 42 U.S.C. § 405(g), challenging the denial of her benefits.

### III.   <u>LEGAL STANDARD</u>

**A.   <u>Disability Determination Process</u>**

An individual may be entitled to Social Security disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). An impairment can only be disabling if it "results from anatomical, physiological, or psychological abnormalities which

are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).  Furthermore, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

The Commissioner has developed a five-step sequential evaluation process to determine whether a person is disabled.  20 C.F.R. § 404.1520(a)(4); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  "Step one determines whether the plaintiff is engaged in 'substantial gainful activity.'  If he is, disability benefits are denied.  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments."  Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (internal citations omitted).  To establish a severe impairment the claimant must "show that he has an 'impairment or combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs.'"  Id. at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

If the claimant has a severe impairment, the third step is to determine "whether the impairment is equivalent to one of a

number of listed impairments that . . . are so severe as to preclude substantial gainful activity." Id. at 141. If so, the claimant is presumed conclusively to be disabled. Id. If not, before applying the fourth step, the reviewing body must determine the claimant's residual functional capacity, based on relevant medical and other evidence in the case record, to determine what types of work the claimant can do. 20 C.F.R. §§ 404.1520(a)(4), 404.1520(e). If the claimant does not suffer from one of the listed impairments, the fourth step evaluates whether the impairment prevents the claimant from performing his past work. Bowen, 482 U.S. at 141 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The claimant is not disabled if he is able to perform his past work. Id. (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)). If she cannot perform her past work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of his age, education, and work experience." Id. at 142, 146 n.5. During steps one, two, and four, the burden of proof is on the claimant. Id. at 146, n.5. At the fifth step, the burden is on the Commissioner. Id. at 142. If the Commissioner fails to meet this burden, the claimant is entitled to benefits. Id.

**B.   Standard of Review**

In reviewing disability and disability insurance decisions made by the Commissioner, this Court does not make de novo

determinations.  <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).  Rather, it "must affirm the [ALJ's] findings if they are supported by substantial evidence." <u>Cashman v. Shalala</u>, 817 F.Supp. 217, 220 (D. Mass. 1993); <u>see also</u> <u>Rodriquez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (stating that the ALJ's determination must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence is "more than a mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence means such relevant evidence as a "reasonable mind, reviewing the evidence in the record as a whole, could accept . . . as adequate to support [the ALJ's] conclusion."  <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)).  In reviewing the record for substantial evidence, the Court is "to keep in mind that 'issues of credibility and the drawing of permissible inferences from evidentiary facts are the prime responsibility of the Secretary.'" <u>Rodriguez</u>, 647 F.2d at 222 (quoting <u>Rodriguez v. Celebrezze</u>, 349 F.2d 494, 496 (1st Cir. 1965)).  When a conflict exists in the record, the ALJ bears the duty to weigh the evidence and resolve material conflicts in testimony.  <u>See</u> <u>Richardson</u>, 402 U.S. at

399; Irlanda Ortiz, 955 F.2d at 769.  An ALJ's findings of fact, however, are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

In addition to considering whether the ALJ's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied.  "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal."  Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)).

## IV.   DISCUSSION

Plaintiff argues that the ALJ (1) did not base his determination that plaintiff could perform other work in the national economy on substantial evidence in the record; (2) failed to weigh the opinion of plaintiff's treating physician, Dr. Dolliver, properly; (3) erred in assessing the plaintiff's credibility; and (4) did not base his assessment of plaintiff's residual functional capacity on substantial evidence.

## A.   Vocational Evidence

The ALJ reached the fifth and final step of the required inquiry before concluding that the claimant was not disabled:

> [T]he claimant has the residual functional capacity to
> perform a wide range of sedentary work . . . a moderate
> impairment in maintaining attention and concentration
> such that the claimant is able to maintain
> concentration and attention sufficient to perform
> simple work tasks for an eight hour work day, assuming
> short breaks on average every two hours; and a moderate
> impairment in dealing appropriately with the public,
> co-workers, and supervisors such that the claimant is
> able to interact with the public on an occasional basis
> . . . .

(Tr. at 12.)  Plaintiff contends that, based on this assessment

of her residual functional capacity, the ALJ's conclusion that

she retained the capacity to perform other work in the national

economy was not supported by sufficient legal foundation.

Although the ALJ noted that the Medical-Vocational

Guidelines ("the Grid") would support a finding that plaintiff is

not disabled, if an applicant has non-exertional limitations

(such as mental, sensory, or skin impairments, or environmental

restrictions, such as an inability to tolerate dust) that

restrict her ability to perform jobs she would otherwise be

capable of performing, then the Grid is only a "framework to

guide [the] decision."  20 C.F.R. § 416.969a(d).

In addition to the Grid, the Social Security Administration

uses the Dictionary of Occupational Titles ("DOT") and Vocational

Experts ("VEs") to determine which jobs in the national economy a

claimant can perform:

> [W]e rely primarily on the DOT (including its companion
> publication, the SCO) for information about the
> requirements of work in the national economy. . . . We
> may also use VEs and [vocational specialists] at these
> steps to resolve complex vocational issues . . . .

> Occupational evidence provided by a VE or VS generally
> should be consistent with the occupational information
> supplied by the DOT.  When there is an apparent
> unresolved conflict between VE or VS evidence and the
> DOT, the adjudicator must elicit a reasonable
> explanation for the conflict before relying on the VE
> or VS evidence to support a determination or decision
> about whether the claimant is disabled. . . . Neither
> the DOT nor the VE or VS evidence automatically
> "trumps" when there is a conflict.  The adjudicator
> must resolve the conflict by determining if the
> explanation given by the VE or VS is reasonable and
> provides a basis for relying on the VE or VS testimony
> rather than on the DOT information.

SSR 00-4p, Use of Vocational Expert and Vocational Specialist

Evidence, and Other Reliable Occupational Information in

Disability Decisions, 65 Fed. Reg. 75,759, 75,760 (Dec. 4, 2000)

(footnote, citations, and section heading omitted).

At the hearing on December 4, 2008, the ALJ asked the

vocational expert if someone with plaintiff's age, education,

work experience, and residual functional capacity could continue

to perform either of the jobs plaintiff performed in the past.

(Tr. at 45.)  Mr. LaRaia testified that someone with plaintiff's

impaired concentration and ability to interact with others could

not perform either of plaintiff's past jobs.  However, he

testified that there existed a significant number of jobs in the

regional economy that can be performed by someone with

plaintiff's limitations, such as assembler, packager, production

inspector, surveillance monitor, a sewing position, or a security

position with no intervention.  Mr. LaRaia stated that all of

these jobs are characterized as "sedentary" and "unskilled."

(Id. at 46.)  When asked by the ALJ, Mr. LaRaia affirmed that his
testimony was consistent with the Dictionary of Occupational
Titles.  (Id.)  The ALJ stated, "Based on the testimony of the
vocational expert, . . . the claimant is capable of making a
successful adjustment to other work that exists in significant
numbers in the national economy."  (Id. at 21.)

Plaintiff contends that the VE failed to provide DOT
reference codes that would identify the jobs that she allegedly
could perform, and that the job titles provided by the VE do not
match those listed in the DOT.  Furthermore, some of the jobs in
the DOT that seem to match the titles provided by the expert are
defined in the DOT as exceeding the "sedentary and unskilled"
level of work that matches plaintiff's residual functional
capacity.[1]  Thus, the vocational expert's testimony was
inconsistent with the information in the DOT, and he did not
provide enough information to locate descriptions of these jobs
in the DOT.  Defendant concedes that the expert's testimony is
now beyond rehabilitation.  (Def.'s Br. at 14 n.8.)  The ALJ
relied on the vocational expert's testimony in concluding that
plaintiff was not disabled, and he did not address the

---

[1] The job of "packager" is described in the DOT as requiring
a "medium" level of exertion.  The DOT describes the job "hand
sewer" as "semi-skilled."  Jobs that seem to match the title
"production inspector" are all listed as "light and skilled."
The other job titles listed by the VE were too vague for
plaintiff to find close analogues in the DOT that comply with
plaintiff's residual functioning capacity.  (Pl.'s Br. at 22-23.)

inconsistencies between the expert's testimony and the DOT, as
required by the Commissioner's regulations.  Counsel did not
raise this issue at the hearing.  However, defendant does not
assert that plaintiff's failure to raise the inconsistencies
between Mr. LaRaia's testimony and the DOT during the hearing
precludes plaintiff from doing so on appeal.  It may be that
plaintiff has the capacity to perform substantial work that
exists in the national economy.  However, the ALJ must consider
appropriate vocational evidence on remand to make this
determination.

**B.   Consideration of Treating Sources' Opinions**[2]

Plaintiff contends that the ALJ, in assessing her residual
functioning capacity, improperly disregarded the opinions of her
treating psychiatrist, Dr. Dolliver, and her therapist, Ms.
Theofanides (who is not a doctor).  The ALJ generally must give
controlling weight to a treating physician's opinion, "since
these sources are likely to be the medical professionals most
able to provide a detailed, longitudinal picture" of the
patient's medical condition.  20 C.F.R. §§ 404.1527(d)(2),
416.927(d)(2).  However, the ALJ is "not obligated automatically
to accept [her] conclusions."  Guyton v. Apfel, 20 F. Supp. 2d
156, 167 (D. Mass. 1998).  Controlling weight is given only if

---

[2]  Although the case will be remanded, the court rejects
plaintiff's remaining contentions.  Accordingly, the scope of the
remand is narrow.

the "treating source's opinion on the issue(s) of the nature and severity of [the patient's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Furthermore, the ultimate determination of disability is left to the ALJ.  <u>See</u> 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

If the treating physician's report is not given controlling weight, the ALJ must consider six factors to determine what weight to give it:

> 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinions reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion.

<u>Guyton</u>, 20 F. Supp. 2d at 167 (citing 20 C.F.R. § 404.1527(d)(2)-(6)).  The regulations do "not mandate assignment of some unvarying weight to every report in every case."  <u>Id.</u> (citation omitted).  However, the ALJ must give "good reasons" for the weight given to the treating physician's opinions.  20 C.F.R. § 416.927(d)(2).

The treating and non-treating physicians all agreed that plaintiff had a mental disorder, but they disagreed as to whether her difficulty in functioning was moderate (with a GAF of 60) or serious (with a GAF of 50).  Ms. Theofanides and Dr. Estes opined

-18-

she had a GAF of 50.  Dr. Cserr believed the GAF of 60.  The
treating psychiatrist stated her GAF on July 6, 2007 was 50, but
the highest in the past year was 65.  In his opinion, the ALJ
recounted that Dr. Dolliver, the treating psychiatrist, reported
in her progress notes that plaintiff "had an organized thought
process, affect appropriate to content, was alert and oriented
times 3; denied suicidal/homocidal ideation; [and] had good
insight with judgment intact . . . ."  (Id.)  He also explained
that Dr. Kellerman noted that plaintiff had chronic depression
that "waxed and waned", but did not significantly restrict her
functioning.  The ALJ noted that Dr. Cserr found that plaintiff
was "alert, cooperative, her affect generally quite appropriate,
speech appropriate, clear and coherent; thought process and
content appropriate."  (Id.)  Dr. Cserr found that she was not
paranoid, delusional, or psychotic, and she did not experience
hallucinations.  The ALJ determined that Dr. Cserr's findings
supported his decision to set her GAF score at 60.

Conversely, the ALJ denied controlling weight to Dr.
Dolliver's assessments indicating that plaintiff's memory,
concentration, comprehension, and judgment were severely
impaired.  He stated, "Dr. Dolliver's assessment in July 2008
that she found the claimant markedly impaired in ability to
understand, remember, and carry out complex instructions, make
judgments on complex work-related decisions, and to maintain
concentration for extended periods of time is not consistent even

-19-

with her own findings, and to an even greater extent lacks consistency with the rest of the record." (<u>Id.</u> at 19-20.)  The ALJ indicated that such an assessment contradicts Dr. Dolliver's own findings, as well as those of Dr. Cserr, who evaluated plaintiff.  Both determined that plaintiff's mood and speech were appropriate, she had an organized and coherent thought process, she was alert and oriented, and she possessed good insight and judgment.  Furthermore, he pointed out, just before completing her negative assessment in July 2008, Dr. Dolliver reported that plaintiff did not have a low IQ, was alert and oriented, denied suicidal or homicidal ideation, and had thought content "within normal expectations." (<u>Id.</u>)  Dr. Dolliver indicated at that time that plaintiff's condition was not chronic and substantial improvement was expected in the future.

Likewise, the ALJ reasonably disregarded the medical opinion assessing plaintiff's GAF score at 50.  He decided that Dr. Estes' assessment was contradicted by her finding that plaintiff scored 29/30 on a Mini-Mental Status Examination and only occasionally had difficulty focusing or maintaining attention.  "Moreover, those assessments are contradict [sic] by treatment records that repeatedly noted the claimant had an organized thought process, affect appropriate to content, was alert and oriented times 3, denied suicidal/homocidal ideation; and had good insight with judgment intact." (<u>Id.</u>)  The ALJ stated that he "has carefully considered the assessment [of Dr. Dolliver and

Ms. Theofanides] and does not find it probative in this case."

(Id.)

A determination as to whether a mental impairment is moderate or severe is particularly difficult here where plaintiff's condition varied between GAF 50 and 65.  Because the treating physician's assessment was contradicted by her own notes and the opinions of other medical sources, the ALJ acted within his discretion to deny controlling weight to plaintiff's treating psychiatrist's opinion.  See Anderson v. Astrue, 682 F. Supp. 2d 89, 96 (D. Mass. 2010) (stating that treating physician's determination of plaintiff's disability may not be given controlling weight when contradicted by physician's own treatment notes and the opinions of other medical experts); cf. Nguyen, 172 F.3d at 35 (concluding that an ALJ's disregard of treating physician's opinion was improper when physician's opinion was not controverted by any other medical opinion in the record).

**C.   Credibility**

Finally, Plaintiff alleges that the ALJ improperly disregarded her testimony as to the severity and persistence of her pain, fatigue, lack of focus, and depression.  To establish a claim of disability due to pain or other subjective symptoms, a plaintiff must first show that she has a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged."  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 21 (1st Cir. 1986).  If so, the ALJ must then consider the

intensity and persistence of the plaintiff's symptoms as well as
the functional impact those symptoms may have on her ability to
work.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); Makuch v.
Halter, 170 F. Supp. 2d 117, 126 (D. Mass. 2001).  In making this
determination, the ALJ must consider all available objective
medical evidence.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).
However, a plaintiff's statements regarding the intensity and
persistence of her pain and its impact on her ability to work
will not be rejected solely because they are not substantiated by
the available objective medical evidence.  20 C.F.R. §§
404.1529(c)(2), 416.929(c)(2).

The regulations recognize that a person's symptoms may be
more severe than the objective medical evidence suggests.  See 20
C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Therefore, several
factors (known as the Avery factors) should be considered when an
applicant alleges pain: (1) the claimant's daily activities; (2)
the location, duration, frequency, and intensity of the pain; (3)
precipitating and aggravating factors; (4) the type, dosage,
effectiveness, and side effects of any medication taken to
alleviate the pain or other symptoms; (5) treatment, other than
medications, received to relieve pain or other symptoms; (6)
measures used by claimant to relieve pain or other symptoms; and
(7) any other factors relating to claimant's functional
limitations and restrictions due to pain.  Avery, 797 F.2d at 28-
29; see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

To complete the analysis, the ALJ often must make a determination regarding the credibility of a plaintiff's statements about the intensity of her pain and other symptoms, as well as their effect on her functional abilities.  SSR 96-7p, Evaluation of Symptoms in Disability Claims, Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996).  Although the ALJ's credibility determination generally is entitled to deference, "an ALJ who does not believe a claimant's testimony regarding his pain, 'must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant].'"  Makuch, 170 F. Supp. 2d at 126 (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (alterations in original)).

Furthermore, "[i]n weighing the evidence and evaluating the claimant's credibility, the ALJ is entitled to consider the 'consistency and inherent probability of the testimony.'" Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 n.1 (1st Cir. 1987) (quoting Beavers v. Sec'y of Health, Educ. & Welfare, 577 F.2d 383, 387 (6th Cir. 1978)).  When inconsistencies exist in the record, the ALJ is permitted to "discount subjective complaints of pain."  Id. (citing Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1987)).

In her testimony, plaintiff complained of chronic pain every day, fatigue, and poor memory and concentration.  The ALJ

concluded:

> [T]he claimant's medically determinable impairments
> could reasonably be expected to produce some symptoms
> of the type alleged, but . . . the claimant's
> statements concerning the intensity, persistence and
> limiting effects of these symptoms are not entirely
> credible.  The alleged limitations in attention,
> concentration, memory and the inability to interact
> appropriately with other people are not substantiated
> by competent medical evidence to the degree alleged.
> The alleged frequency, severity and duration of the
> claimant's depression and pain are not supported by the
> weight of the medical evidence to the degree alleged.

(Tr. at 17).

Although he does not name each of the <u>Avery</u> factors in his

opinion specifically, the ALJ considered all of them in analyzing

plaintiff's credibility.  He considered plaintiff's daily

activities, which include washing dishes, light dusting,

vacuuming, laundry, grocery shopping, watching educational

television, reading, playing scrabble, making rugs and pillows,

and playing with her dogs.  The ALJ determined that these

activities are "consistent with an individual who lives

independently, and adequately maintains a household."  (<u>Id.</u>)

The ALJ also noted the location, duration, and frequency of

her pain, stating that it was felt every day throughout her body,

and particularly affected her back, knees, and hands.  He

indicated that at least one of her treating physicians reported

that her pain had no provoking factors and that her daily

activities remained intact.  He also mentioned the medications

plaintiff was prescribed, including Trazadone, Xanax, Zoloft,

-24-

Interferon Ribovirin therapy, Lodine, Xylocaine, and Celestrone. The ALJ mentioned repeatedly that plaintiff reported no adverse side effects from these medications.  In addition to considering her medications, the ALJ noted that plaintiff has received other treatments to relieve her symptoms, including trigger finger release surgery and physical therapy.  He even reported that plaintiff claimed that her pain from fibromyalgia was alleviated with cannabis, which has never been prescribed for her condition.

Furthermore, the ALJ noted that plaintiff's credibility is undermined by inconsistencies between her testimony and other evidence in the record.  He indicated that there are no x-rays, MRIs, nerve conduction studies, ENGs, or CT scans that would suggest that plaintiff is unable to work.  She has never been hospitalized or required surgery for her joint pain.  The ALJ recounted the results of many medical tests and has found no objective corroboration for the amount of pain alleged by the claimant.  He also noted that she testified in December 2008 that she generally was very fatigued, but, only four months earlier, she told her doctor that she was not suffering from fatigue.  In April 2007 she reported that she does not drive, but in December 2008, she reported that she stopped driving in October 2008. Finally, her medical records indicate that she had difficulty with her memory, but in a function report, she stated that she hardly ever forgot to take her medication and even reminded her friend of his bills and doctor's appointments.

-25-

Thus, the ALJ has compared plaintiff's testimony regarding her symptoms with objective medical evidence, as well as her own previous statements, and determined that her descriptions of the severity of her symptoms were not credible.  The Court finds no reason to upset that conclusion.  Since the Court has found substantial support for the ALJ's decisions regarding both plaintiff's treating sources and credibility, the Court finds no reason to overturn the ALJ's assessment of plaintiff's residual functioning capacity.

### ORDER

Defendant's Motion for an Order Affirming the Decision of the Commissioner [Docket No. 22] is **DENIED**.  Plaintiff's Motion to Reverse the Decision of the Commissioner [Docket No. 16] is **DENIED**, but the motion to remand is **ALLOWED** for further consideration of the vocational evidence.

 /s/ PATTI B. SARIS
Patti B. Saris
United States District Judge